OPINION
{¶ 1} Appellant, Benjamin D. Hudach, appeals from a final judgment of the Trumbull County Court of Common Pleas, denying his motion to withdraw his guilty plea. For the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} The Trumbull County Grand Jury indicted appellant on the following five counts: (1) aggravated murder with prior calculation and design, with specifications of aggravating circumstances under R.C. 2929.04(A)(2), (A)(5), and (A)(7); (2) aggravated murder while committing or attempting to commit or while fleeing the commission of aggravated burglary, with specifications of aggravated circumstances under R.C.2929.04(A)(2), (A)(5), and (A)(7); (3) attempted aggravated murder, with a firearm specification; (4) conspiracy to commit aggravated murder; and (5) aggravated burglary, with a firearm specification. Counts 1 and 2 identified Ann Serafino as the victim. Counts 3 and 4 identified both Ann Serafino and her son, Charles Serafino, as the victims.
 {¶ 3} The charges stemmed from the murder of Ann Serafino and the attempted murder of Charles Serafino, during the early morning hours of July 7, 1995, at the Serafino residence in Trumbull County. According to the state, appellant was one of four persons responsible for the murder of Ann Serafino, the attempted murder of her son, and the aggravated burglary of the Serafino residence. The other individuals involved in the murder-for-hire scheme included John Santine ("Santine"), Jason Getsy ("Getsy"), and Rick McNulty ("McNulty"). Joshua Koch ("Koch") had some level of involvement in the events leading up to the offenses, but he was never indicted or offered prosecutorial immunity for any testimony.
 {¶ 4} On the trial date of September 3, 1996, appellant appeared before the court and pleaded guilty to an amended indictment pursuant to a plea bargain with the state. In exchange for appellant's cooperation and testimony against his co-conspirator, Santine, the state agreed to move the court to dismiss all specifications in the indictment and to dismiss Counts 2 and 4 of the indictment. Appellant entered both a written and oral plea of guilty to complicity to aggravated murder, complicity to attempted aggravated murder, and complicity to aggravated burglary.
 {¶ 5} The record contains a transcript of the plea hearing. After the requisite Crim.R. 11 exchange, whereby the trial court personally addressed appellant and advised him of his rights pursuant to Crim.R. 11, the trial court accepted appellant's guilty plea.
 {¶ 6} The state thereafter advised the trial court of the factual basis of the plea. According to the prosecutor, "on or about July 7, 1995, while in Trumbull County, [appellant] did commit the offenses of Complicity to Aggravated Murder, Complicity to Attempted Aggravated Murder, and Complicity to Burglary.
 {¶ 7} "The evidence, in the form of testimony and exhibits, would show that on July 6, 1995, co-defendant [Santine] offered to pay [appellant], along with co-defendants [McNulty] and [Getsy], $5,000.00. That this money was to be paid for them to kill Charles Serafino as well as any witnesses.
 {¶ 8} "Pursuant to this murder for hire scheme, [appellant], along with codefendants * * *, cleaned three weapons: a Russian SKS assault rifle, a .12 gauge shotgun, and a .357 magnum revolver. They cleaned these weapons with Gumout to remove traces of fingerprints. The three then put on latex gloves and proceeded to the * * * home of Charles Serafino. They were driving the car belonging to [Getsy] but could not find a parking place. They then returned to the McNulty apartment where they met up with [Santine] again. Dressed in camouflage, they then proceeded in [Santine's] car to go back to the location of the Serafino residence. [Santine] dropped them at this location. In their possession were the SKS, the .12 gauge shotgun and the .357, along with [Santine's] cell phone and [appellant's] pager * * *.
 {¶ 9} "While in route to this residence, after being dropped off by [Santine], [appellant] hurt his ankle. He then handed his weapon, a .12 gauge shotgun, along with his pager, to [McNulty]. He then remained behind dirt piles nearby to act as a lookout.
 {¶ 10} "[McNulty] and [Getsy] then proceeded to the Serafino residence. There, the two received the signal 666 from [appellant] on his cell phone to the pager he had given to [McNulty]. This signaled McNulty and Getsy that the coast was clear. They then, McNulty and Getsy, proceeded to shoot out the rear sliding glass doors of the Serafino residence, striking the victim, Charles Serafino, who was laying on a love seat watching T.V. Getsy, who had the only loaded weapon at this point, then followed Charles Serafino into the residence. He then shot Charles Serafino in the face. Ann Serafino, who was awakened by the noises, came from her bedroom and was shot at least twice by [Getsy].
 {¶ 11} "[Appellant], after hearing these shots, then called on his cell phone to the McNulty apartment were [Santine] was and told [Santine] that the job was done. Getsy and McNulty then met up with [appellant] and the three then fled on foot to the McNulty residence, where they took baths and discarded of [sic] their clothing. The weapons were ditched in the woods along the way. [The men], along with [Santine], then discussed what had transpired. [Santine], at this point, offered to pay the three $10,000.00. [Appellant] stated he did not wish any money, this was a personal favor to [Santine]. This was overheard by [McNulty] and [Koch], witnesses for the State of Ohio who would testify.
 {¶ 12} "Later the same day, [appellant] was overheard again discussing the homicide and attempted homicide. He was overheard to tell a friend, Matt Bartlett [("Bartlett")], that he killed someone, that it was a rush.
 {¶ 13} "The State would put into evidence the three various witnesses who overheard the murder for hire plot, and also the witnesses who overheard the statements made by [appellant] after the fact.
 {¶ 14} "Additionally, the State would introduce into evidence the records of the cell phone and the pager, which would show the * * * call made by [appellant] to [McNulty] signaling him that the coast was clear and, furtherance, of his role as a lookout, as well as the call to [Santine] telling him that the job was done."
 {¶ 15} Although defense counsel disputed some of the state's characterization of appellant's participation, defense counsel acknowledged that appellant did participate in the scheme and that appellant accepted responsibility for his participation.
 {¶ 16} Appellant never proclaimed his innocence at the plea hearing.
 {¶ 17} Charles Serafino then spoke, stating that if appellant honestly wanted to remove himself from the situation or abort the scheme, he only had to use the cell phone he held in his own hand. Appellant could have called 911.
 {¶ 18} The trial court then sentenced appellant to a term of life imprisonment with eligibility for parole after twenty years on his conviction for complicity to aggravated murder; an indefinite term of ten to twenty-five years of imprisonment on his conviction for complicity to attempted aggravated murder; and an indefinite term of ten to twentyfive years of imprisonment for his conviction for the complicity to aggravated burglary. The sentences were to be served concurrently. The trial court memorialized appellant's sentence in a September 5, 1996 judgment entry.[1]
 {¶ 19} On March 27, 1997, appellant filed a petition for postconviction relief with the trial court. Appellant alleged that his pleas were not made knowingly, intelligently, and voluntarily because he was deprived of effective assistance of counsel. Appellant alleged that he agreed to plead guilty only because his counsel coerced him into entering the pleas on the basis of false misrepresentations about the strength of the state's case. In the alternative, appellant contended that his counsel was deficient in failing to investigate whether the state actually intended to call Bartlett as a witness. Attached to appellant's motion were affidavits signed by appellant; co-defendant McNulty, who also entered a plea; and state's witness Koch. Appellant requested a hearing.
 {¶ 20} The trial court denied the petition without a hearing. Appellant appealed, and this court affirmed the trial court's decision. State v. Hudach (Sept. 24, 1999), 11th Dist. No. 98-T-0071, 1999 Ohio App. LEXIS 4476. Subsequently, the Supreme Court of Ohio declined to accept jurisdiction in the matter.
 {¶ 21} Because the thirty-day time limit in which to file a timely direct appeal expired, appellant filed a motion for leave to pursue a delayed appeal on March 20, 2000. In an order dated May 8, 2000, this court denied appellant's motion on the ground that appellant did not supply a reason why he did not perfect his appeal in a more timely manner.
 {¶ 22} On April 22, 2003, appellant moved to withdraw his plea and requested an evidentiary hearing on the motion. Appellant argued that changed testimony of Koch, Bartlett, and McNulty created a manifest injustice necessitating withdrawal of his plea.
 {¶ 23} The trial court issued a judgment entry, dated April 22, 2003, denying appellant's motion without a hearing. The trial court explained its rationale in great detail.
 {¶ 24} From this judgment, appellant now appeals and sets forth the following assignment of error for our consideration:
 {¶ 25} "[1.] The Trial Court Abused Its Discretion By Denying The Appellant's Motion To Withdraw His Guilty Pleas."
 {¶ 26} Crim.R. 32.1 governs withdrawal of a plea. Crim.R. 32.1 provides:
 {¶ 27} "A motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct a manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw her plea." See, also, State v. Smith (1977), 49 Ohio St.2d 261,264. Thus, to withdraw a guilty or no contest plea after sentencing has taken place, a defendant must show that the withdrawal is necessary to correct a manifest injustice. The burden of establishing the existence of manifest injustice is on the defendant. Id. at paragraph one of the syllabus; State v.Whiteman, 11th Dist. No. 2001-P-0096, 2003-Ohio-2229, at ¶ 17.
 {¶ 28} Although a trial court must conduct a hearing to determine whether there is a reasonable and legitimate basis for the withdrawal of a guilty plea if the request is made before sentencing, the same is not true if the request is made after the trial court has already sentenced the defendant. Whiteman at ¶ 19, citing State v. Xie (1992), 62 Ohio St.3d 521, paragraph one of the syllabus. In those situations where the trial court must consider a postsentence motion to withdraw a guilty plea, a hearing is only required if the facts alleged by the defendant, and accepted as true, would require withdrawal of the plea. Id., citing Xie.
 {¶ 29} A trial court is vested with sound discretion to grant or deny a postsentence motion for withdrawal of a plea. State v.Pearson, 11th Dist. Nos. 2002-G-2413 and 2002-G-2414, 2003-Ohio-6962, at ¶ 7. In reaching its decision, a trial court has the discretion to determine the "good faith, credibility and weight of the movant's assertions * * *." Smith at paragraph two of the syllabus. See, also, State v. Caraballo (1985),17 Ohio St.3d 66, 67. Importantly, "`an undue delay between the occurrence of the alleged cause for withdrawal of a guilty plea and the filing of a motion under Crim.R. 32.1 is a factor adversely affecting the credibility of the movant and militating against the granting of the motion.'" State v. Bush,96 Ohio St.3d 235, 2002-Ohio-3393, at ¶ 14, quoting Smith at paragraph three of the syllabus.
 {¶ 30} Accordingly, our review of a trial court's denial of a motion to withdraw a guilty plea is limited to a determination of whether the trial court abused its discretion. State v. Gibbs
(June 9, 2000), 11th Dist. No. 98-T-0190, 2000 Ohio App. LEXIS 2526, at 6-7. An abuse of discretion connotes more than an error of law or judgment; instead, it implies the trial court's attitude was unreasonable, arbitrary, or unconscionable. Statev. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 31} Turning to the instant matter, appellant argues that the trial court erred by denying his motion to withdraw his plea without a hearing. According to appellant, there exists a manifest injustice necessitating withdrawal of his plea because he relied heavily on his belief that Bartlett, Koch, and McNulty, who would now testify in his favor, would have testified against him at trial. Appellant's arguments are not well-taken.
 {¶ 32} Our review of the transcript of the plea hearing reveals that the trial court engaged in a lengthy dialogue with appellant and complied with the dictates of Crim.R. 11 when accepting appellant's pleas. The trial court asked appellant whether he discussed the matter with his attorneys, whether he understood both of his attorneys were highly qualified to represent him, and whether he was satisfied with his representation and advice. Appellant answered affirmatively.
 {¶ 33} Next, the trial court informed appellant that, after it accepted his plea, it would proceed to sentence him and that his sentence involved life imprisonment on one count and could involve life imprisonment with a possibility of parole in twenty years on the remaining counts. The trial court explained appellant's constitutional rights, and appellant verified that he was waiving those rights. Appellant also indicated that he signed a written waiver after reviewing it with his counsel. The written plea is contained within the record. The written plea indicated that appellant was "making a plea voluntarily and with the understanding of the nature of the charges and the consequences, including the penalty, of the plea * * *."
 {¶ 34} At no point did it appear that appellant did not enter his plea knowingly, voluntarily, and intelligently. As such, we cannot conclude that there existed a manifest injustice necessitating withdrawal of his plea.
 {¶ 35} In that alternative, a hearing is not warranted on appellant's motion based upon the substance of his arguments. We will address appellant's arguments regarding the three witnesses in a consolidated fashion because they implicate similar issues. Ultimately, appellant's assignment of error is not well-taken.
 {¶ 36} "[T]he equivocation of a prosecuting witness, in itself, is insufficient to mandate that [a] defendant be allowed to withdraw his guilty plea." State v. Crum (Mar. 30, 1993), 10th Dist. No. 92AP-1175, 1993 Ohio App. LEXIS 1869, at 5. See, also, State v. Harris (Mar. 23, 1989), 8th Dist. No. 55147, 1989 Ohio App. LEXIS 1004. In Harris, the reviewing court held that a motion to withdraw a plea, based upon recantation of testimony by a state's witness, does not meet the liberal presentence standard to withdraw a plea. Id. at 8. Appellant's motion was postsentence.
 {¶ 37} In the instant matter, appellant first argues that the trial court erroneously determined that his argument regarding Bartlett's testimony is barred by res judicata. We agree.
 {¶ 38} As an initial matter, we note that appellant never put forth any actual argument regarding this issue in either his motion to withdraw his plea or in his appellate brief. Instead, in his motion, appellant brought our attention to his prior appeal, Hudach, 1999 Ohio App. LEXIS 4476, and took a defensive position, arguing that the argument is not barred by res judicata. As such, no argument pertaining to Bartlett's testimony is contained within the record of this matter. Nevertheless, it appears as if appellant intended to argue that he entered his plea based upon his understanding that Bartlett would testify against him. Appellant intended to argue that, because he is now aware that Bartlett would testify in his favor, a manifest injustice exists necessitating withdrawal of his plea.
 {¶ 39} The trial court erred in finding that this argument is barred by the doctrine of res judicata. Res judicata prevents consideration of any claim that was raised or could have been raised in an earlier appeal. State v. Szefcyk,77 Ohio St.3d 93, 1996-Ohio-337, syllabus. In appellant's petition for postconviction relief, he argued that he agreed to plead guilty to the charges only because his counsel coerced him into entering the pleas on the basis of false misrepresentations about the strength of the state's case, including potential testimony on behalf of Bartlett. The crux of this argument alleged ineffective assistance of counsel.
 {¶ 40} We held that appellant had not established that his counsel was ineffective. Hudach. In that opinion, we alluded that both appellant and his trial counsel correctly understood that, at that time, the state possibly had a strong case against appellant. Id.
 {¶ 41} In his motion to withdraw his plea, appellant again argued that he entered his pleas based on a false understanding of the strength of the state's case, including the potential testimony of Bartlett. This time, appellant argued that, regardless of whether his counsel was ineffective, the changed story of Bartlett, in itself, creates a manifest injustice to withdraw his plea.
 {¶ 42} In short, the trial court erred by determining that appellant's argument is barred by res judicata. In Hudach, we held that appellant's trial counsel was not ineffective for allegedly misinforming him about the strength of the state's case. Id. at 22. We did not take any position on whether appellant was actually misinformed or whether the fact that Bartlett may have changed his story created a manifest miscarriage of justice. Further, a petition for postconviction relief is not a proper vehicle to argue that there exists a manifest injustice necessitating withdrawal of a plea. Appellant could not have made his current arguments in his petition for postconviction relief, and the trial court erred by determining that this part of his motion is barred by res judicata.
 {¶ 43} A review of the substance of appellant's argument reveals it is without merit. Appellant is correct in his statement that, in Hudach, we determined that Bartlett may have testified in appellant's favor. However, the state never submitted a witness list to the court, and both appellant and the state listed Bartlett as a potential witness in reciprocal discovery. The record contains no subpoena for Bartlett, and the state did not file any subpoenas for the upcoming trial. This does not mean, however, that the state did not or would not subpoena Bartlett if a plea agreement had not been reached before trial.
 {¶ 44} As we stated in Hudach, "[t]he record is consistent with the notion that Bartlett changed his story every time someone talked to him. At best, * * * no one knew for sure what Bartlett would say if he were called [as a witness]." Id. at 20. As such, appellant cannot successfully argue that his understanding that Bartlett would testify on behalf of the state played a significant factor in his acceptance of the plea agreement.
 {¶ 45} In summary, nobody knew how Bartlett would have testified. Appellant has failed to supply us with an affidavit from Bartlett indicating he would testify in favor of appellant, and appellant's self-serving allegations are not enough to warrant a hearing. See, e.g., State v. Nicholson, 5th Dist. No. 2004CA00027, 2004-Ohio-4850, at ¶ 18; State v. Patterson, 5th Dist. No. 2002CA00135, 2004-Ohio-1569, at fn.3, citing State v.Laster, 2nd Dist. No. 19387, 2003-Ohio-1564.
 {¶ 46} Further, pursuant to Crum, a change in potential testimony of a state's witness is insufficient to withdraw a plea postsentence. Even under the liberal presentence standard, such an equivocation is insufficient to withdraw a plea. See, e.g.,Harris. Appellant's argument is not well-taken.
 {¶ 47} Appellant also argues that the trial court erred by finding his argument regarding Koch's testimony without merit. In his motion, appellant argued that he made his plea in reliance that Koch, a co-conspirator, would testify against him. Appellant contends that, because Koch has now "totally recanted" his testimony, the trial court erred by overruling his motion to withdraw his plea. We disagree.
 {¶ 48} The Ohio Supreme Court recounted Koch's testimony inState v. Getsy, 84 Ohio St.3d 180, 183, 1998-Ohio-533. This testimony described the murder-for-hire scheme and indicated that appellant acted as a lookout and participated as a favor for Santine. Koch's testimony at the Santine trial was markedly similar. State v. Santine (June 26, 1998), 11th Dist. No. 97-A-0025, 1998 Ohio App. LEXIS 2936.
 {¶ 49} Now, in his affidavit, Koch states "[appellant] hurt his ankle and we had to use him as a lookout. I knew right then that [appellant] didn't do anything, that he faked spraining his ankle to get out of it." Koch also stated in his affidavit that appellant "couldn't hurt a fly" and "was a care giver."
 {¶ 50} As the trial court aptly noted in its judgment entry, "[a]t no time does [Koch] state that he lied under oath during either the Getsy or Santine trial. The only portion of [Koch's] Getsy trial testimony which he seems to retract or dispute is his characterization of [appellant] as a `hit man' for John Santine."
 {¶ 51} The trial court was also correct in noting "that [Koch's] description of [appellant] is thoroughly inconsequential to what [Koch] writes in his affidavit concerning [appellant's] repeatedly detailed involvement in the Serafino shooting." Appellant's affidavit only reinforces his testimony in the Getsy and Santine trials, where he places himself squarely in the conspiracy and preparation to kill Charles Serafino. Regardless of whether appellant feigned a sprained ankle or never fired a weapon, he used his apartment as a staging ground, dressed up in camouflage, cleaned weapons, acted as a lookout, used a cell phone to alert his co-conspirators that the coast was clear for the shooting, called Santine to indicate that the job was done, and participated in the escape through the woods.
 {¶ 52} Koch's affidavit fails to extricate appellant from the crimes. There exists strong evidence that appellant may have deliberately chosen to stay behind and act as a lookout because he did not want to be physically at the murder scene. However, equally strong evidence demonstrates that appellant was still a crucial part of the scheme. He helped to plan the murders, he acted as a lookout, and he helped to conceal evidence.
 {¶ 53} We cannot conclude that the trial court abused its discretion by finding that Koch's affidavit was not a "recantation." At best, the affidavit somewhat minimizes appellant's involvement. The affidavit did not extricate appellant from the crimes. In the alternative, a recantation cannot serve as a basis to withdraw a plea pre-sentence, let alone postsentence as appellant requests. See, e.g., Harris;Crum.
 {¶ 54} Appellant also argues that the trial court erred by finding that appellant's motion did not warrant a hearing based upon McNulty's affidavit. Again, appellant argues he pleaded guilty because he was "quite apprehensive" that McNulty would provide testimony against him in exchange for McNulty's plea agreement with the state. Appellant contends that McNulty's affidavit demonstrates that he never joined the conspiracy. This argument is without merit.
 {¶ 55} McNulty stated in his affidavit that "I knew [appellant] faked spraining his ankle, to get out of going to the Serafino residence." McNulty's affidavit also indicates that,after the crimes, he and appellant were fearful that Santine would harm appellant because appellant did not enter the house and because Charles Serafino survived the shootings. Although these statements indicate fear after the crimes, they in no way indicate that appellant participated with the plan in fear of harm or death by Santine.
 {¶ 56} Further, McNulty's affidavit is dated April 14,1997. Appellant's motion was filed six years later, on April 22, 2003. Appellant knew on the night of the shootings whether he truly faked a sprained ankle to get out of being a hit man. He also knew on April 14, 1997, seven months after his plea, that McNulty would back this version of the story. Such a delay reflects poorly on appellant's credibility. See, e.g., Bush at ¶ 14; Smith at paragraph three of the syllabus. The trial court did not abuse its discretion by concluding that McNulty's affidavit did not compel a hearing on appellant's motion.
 {¶ 57} In summary, the affidavits put forth by appellant do not establish a manifest injustice. Newly discovered evidence which purportedly recants testimony or prior statements is "`looked upon with utmost suspicion.'" State v. Wilburn (Dec. 22, 1999), 4th Dist. No. 98CA47, 1999 Ohio App. LEXIS 6325, at 8, quoting State v. Isham (Jan. 24, 1997), 2d Dist. No. 15976, 1997 Ohio App. LEXIS 207. See, also, State v. Germany (Sept. 30, 1993), 8th Dist. No. 63568, 1993 Ohio App. LEXIS 46, citingUnited States v. Lewis (C.A.6, 1964), 338 F.2d 137, 139. As such, any contradictions between the potential testimony of Koch, Getsy, and McNulty at the time of appellant's plea and their current version of events may suggest a lack of credibility. Further, even the current affidavits conflict among themselves as to the degree of involvement and culpability of appellant. Issues of credibility are left primarily to the trial of fact. State v.DeHass (1967), 10 Ohio St.2d 230, 231.
 {¶ 58} These men offered a version of events which, if believed, support the trial court's conclusion that appellant voluntarily participated and was squarely a part of the conspiracy to kill Charles Serafino and any witnesses.
 {¶ 59} The trial court did not abuse its discretion by denying appellant's motion without a hearing. It complied with Crim.R. 11 when accepting appellant's pleas, and it correctly concluded that the substance of appellant's arguments does not indicate a manifest injustice.
 {¶ 60} In this opinion, we decline to address whether duress is a proper defense to complicity to attempted murder, complicity to aggravated murder, and complicity to aggravated burglary. The defense of duress has long been considered a legitimate defense to most crimes. State v. Sappienza (1911), 84 Ohio St. 63. However, at common law, the exception to that principle is the taking of the life of an innocent person. Getsy at 197-198. In the companion case of Getsy, we squarely addressed the issue and held that duress cannot be asserted as a defense to aggravated murder under R.C. 2903.01(A). Id.
 {¶ 61} One of the essential features of the defense of duress is a sense of immediate, imminent death or serious bodily injury if the actor does not commit the act as instructed. See State v.Cross (1979), 58 Ohio St.2d 482, 487. The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such nature that the actor cannot safely withdraw. See State v. Good (1960), 110 Ohio App. 415.
 {¶ 62} In this matter, appellant does not challenge that he used the apartment he shared with McNulty as a staging ground for the shooting spree, he dressed in camouflage, he cleaned fingerprints from the firearms with Gumout, he wore rubber gloves to avoid detection, he acted as a lookout, he ran through the woods after the crimes ditching the weapons, and he took a bath after the crimes. In appellant's initial interview with the police, he indicated, affirmatively, that he sprained his ankle. He never alluded that he feigned the sprain. The interview was essentially a confession.
 {¶ 63} Appellant did repeatedly state in his initial interview with the police that he did not want to go along with the plan. Regardless, appellant did go along with the plan and was an integral part of the scheme. Affidavits by the co-conspirators indicating that they "just knew" appellant "must have" faked the alleged injury are insufficient to compel us to decide this issue. Further, even if appellant did not want to go along with the plan, not once did appellant articulate in any way, until now, that he did not want to follow through with the plan for fear of bodily injury or death from the hands of Santine.
 {¶ 64} The testimony of affidavits of these men is void of any indication that Santine placed appellant in a sense ofimmediate, imminent death or serious bodily injury. The facts also fail to remotely indicate that any alleged pressure placed on appellant by Santine constantly controlled his will during the entire commission of the crimes.
 {¶ 65} As such, assuming arguendo that duress is a valid defense to the crimes to which appellant pleaded guilty, the facts cannot support such a defense pursuant to Cross andGood. Therefore, we cannot address the merits of duress as a defense to these crimes.
 {¶ 66} Appellant's sole assignment of error is without merit, and we hereby affirm the judgment of the trial court.
Ford, P.J., O'Neill, J., concur.
[1] Neither at the sentencing hearing nor in the judgment entry did the trial court make the appropriate findings to validate appellant's sentence pursuant to State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165. Comer was issued in August 2003, more than seven years after appellant was sentenced. Pursuant to Wallacev. State, 11th Dist. No. 2004-T-0008, 2004-Ohio-2596, Comer
cannot be retroactively applied to the matter sub judice. Appellant never directly appealed his sentence, and we decline to address the propriety of appellant's sentence.